FILED

2012 OCT 10  PM 1: 13

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  MICHAEL B. MILLER
   mmiller@mofo.com
2  CRAIG B. WHITNEY (CA SBN 217673)
   cwhitney@mofo.com
3  ADAM J. HUNT
   adamhunt@mofo.com
4  MORRISON & FOERSTER LLP
   1290 Avenue of the Americas
5  New York, New York 10104
   Telephone: 212.468.8000
6  Facsimile: 212.468.7900

7  MARK R. MCDONALD (CA SBN 137001)
   mmcdonald@mofo.com
8  MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
9  Los Angeles, California  90013
   Telephone:  (213) 892-5200
10 Facsimile:  (213) 892-5454

11 Attorneys for Plaintiff
   NAME.SPACE, INC.

12

13                UNITED STATES DISTRICT COURT

14                CENTRAL DISTRICT OF CALIFORNIA

15                      WESTERN DIVISION

16 NAME.SPACE, INC.,                 Case No. CV12-8676-PA
                                              (PLAx)
17              Plaintiff,

18      v.                           **COMPLAINT**

19 INTERNET CORPORATION FOR          **DEMAND FOR JURY TRIAL**
   ASSIGNED NAMES AND NUMBERS,
20
21              Defendant.

22

23      Plaintiff name.space, Inc. ("name.space"), by and through its undersigned

24 counsel, brings this Complaint against Defendant Internet Corporation for Assigned

25 Names and Numbers ("ICANN"), and alleges as follows:

26

27

28

                                    1

ny-1023809

**INTRODUCTION**

1.      name.space is the originator, operator and promoter of 482 Top Level Domains ("TLDs"), which is the highest level identifier in an Internet "domain name"—such as .com or .gov.

2.      ICANN controls and purports to be responsible for the entire worldwide Internet Domain Name System ("DNS").  The DNS is an essential part of the logical infrastructure that makes the Internet work by assigning unique domain names to computers running web sites and other services including e-mail and voice-over-IP, and by coordinating master computer servers which ensure that all Internet users typing a domain name into their browsers reach the same "host" computer and service.  ICANN has exclusive control in determining whether to permit new TLDs into the DNS and whether to permit interconnection with TLD operators like name.space.  The DNS is the critical, essential intermediary that allows Internet users to reach a website or connect to other services—whose real address is identified by a set of numbers—by typing an alphanumeric domain name in their Internet browser's address bar.

3.      name.space's TLDs have been shut out of the DNS by ICANN and its predecessors, and forced to operate its own network of TLDs, thereby effectively blocking and quarantining name.space TLDs and its registrants' domains from the majority of Internet users.  Instead, ICANN has given priority for any new TLDs to an exclusive group of insiders and industry incumbents who control ICANN, either directly or financially.

4.      In 2000, name.space applied (the "2000 Application") for 118 of its TLDs to be delegated onto the DNS master database known as the "root.zone file," or simply "the Root."  Notwithstanding ICANN's acknowledgement of name.space's qualifications and payment of the $50,000 application fee, ICANN refused to make a final determination of name.space's 2000 Application.  Meanwhile, the same

ny-1023809

1   handful of companies already dominating control of the Internet—many of which

2   have close ties to ICANN's board of directors—received the only new TLDs

3   delegated by ICANN, further entrenching their status as Internet powerhouses and

4   consummate insiders.

5   5.    Nevertheless, when ICANN announced it would hold another round of TLD

6   applications in 2012, name.space relied on representations from ICANN that its

7   2000 Application remained pending, and had not been finally determined.  At no

8   point has name.space been informed of anything to the contrary.

9   6.    Rather than adopting a procedure to account for the pending 2000

10   Application and facilitate the expansion of TLD providers in the DNS, ICANN

11   adopted a procedure so complex and expensive that it once again effectively

12   prohibited newcomers from competing.  It instead has permitted participation solely

13   by ICANN insiders and industry titans.

14   7.    ICANN raised the application fee to $185,000—more than three times the

15   previous amount.  Further, unlike the 2000 round where applicants could apply for

16   multiple TLD strings conforming to a uniform business model in a single

17   application, this time each TLD application required its own non-refundable

18   application fee.  name.space's application for the same 118 TLDs for which it

19   applied in 2000 would thus cost over 436 times more in 2012.  In adopting this

20   process, ICANN effectively and intentionally precluded name.space from

21   implementing its business model of incorporating the simultaneous operation of a

22   significant number of TLDs, which was designed to drive not only name.space's

23   revenue stream but also its competitive appeal to other rights holders seeking to

24   register domain names under multiple TLDs.  This approach by ICANN was

25   consciously adopted as an attack on name.space's business model and a means by

26   which to create and maintain market power in the TLD markets.

27   8.    Even further, not only was the 2012 process anticompetitive, but ICANN

28   allowed applicants to apply for TLDs *that name.space had originated and was*

3

1     *already operating and promoting*.  In other words, the 482 TLDs that name.space

2     originated and has been using in commerce continuously since 1996 were being

3     auctioned off by ICANN to any takers who could afford it, in total disregard to

4     name.space's trademark rights in those TLDs.

5     9.      Finally, through its anticompetitive, self-interested actions, ICANN has

6     created a scenario whereby name.space will be unable to ensure that its contracts

7     with its existing and prospective customers can be performed.  Specifically, if and

8     when ICANN delegates a TLD on the DNS that is identical with a TLD that

9     currently resolves on the name.space network, name.space's customer's websites

10     and other services will effectively be preempted by websites and services that

11     resolve on ICANN's DNS and point to different hosts.  Once again, this serves to

12     benefit only ICANN and the industry insiders and power players whose interests

13     ICANN appears to represent.

14     10.     In fact, on June 13, 2012, ICANN published its list of TLD strings for which

15     applications were submitted to delegate those TLDs to the DNS.  Included on this

16     list were several TLDs that already resolve on the name.space network, including

17     .art, .blog, .book, .design, .home, .inc. and .sucks.  If and when those applications

18     are approved, however, those TLDs will become associated not only with

19     name.space—which has been operating and promoting those TLDs in commerce

20     for over fifteen years—but also with the prospective registers that have paid

21     ICANN $185,000 per TLD.

22     11.     Accordingly, name.space brings this action against ICANN, seeking damages

23     and injunctive and declaratory relief, for violations of the Sherman Act and the

24     Lanham Act, as well as state and common law trademark infringement, unfair

25     competition and tortious interference claims.

26

27

28

ny-1023809

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b) over the claims in this action arising under the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

13.     This Court also has diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that it is a dispute between citizens of different States where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.     This Court also has supplemental jurisdiction over name.space's state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to name.space's federal law claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

15.     This Court has personal jurisdiction over ICANN, because, on information and belief, ICANN is a California corporation with its principal place of business in this District.

16.     The trade and interstate commerce relevant to this action are at least the following: (i) the international market for TLDs and markets for each individual TLD permitted by ICANN to participate in the DNS, and (ii) the markets for wholesale and retail registrations within each TLD.  The activities of ICANN and its co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because ICANN resides in this District and a substantial part of the events giving rise to name.space's claims occurred in this District.

5

**PARTIES**

18.    Plaintiff name.space is a corporation organized under the laws of the State of Delaware, with its principal place of business at 134 West 37th Street, Suite 200, New York, New York.

19.    Upon information and belief, Defendant ICANN is a non-profit corporation organized under the laws of the state of California, with its principal place of business in Marina del Rey, California.  ICANN has the exclusive control over the Internet's DNS.  As discussed further below, ICANN derives its authority to manage the DNS from a series of agreements with the United States government.

**FACTUAL ALLEGATIONS**

**A.    The Architecture of the Internet.**

**1.    The DNS System.**

20.    At heart, the Internet is a series of interconnected servers and computers. Each computer or host server connected to the Internet can be identified by at least one unique Internet protocol ("IP") address, which consists of a string of four sets of numbers between 0 and 255, separated by periods (e.g., 170.11.225.15).

21.    For ease of reference, a DNS was created to link an IP address with a unique alphanumeric "domain name," such as "nytimes.com."  The DNS is a simple, efficient way for Internet users to navigate the web:  remembering that "nytimes.com" is the address for The New York Times website is much easier than remembering its numeric IP address.

22.    The domain name is incorporated into a Uniform Resource Locator ("URL"). When an Internet user types the URL into his or her web browser application (such as Internet Explorer or Firefox), the URL is sent to a DNS server.  The DNS server looks up the IP address assigned to that domain name, and the browser then connects to the server having that IP address, which hosts the desired website.

ny-1023809

## 2.     Top-Level Domains.

23.     The DNS uses a hierarchical structure.  The alphanumeric field to the far right is known as the "Top Level Domain" ("TLD")—such as .com, .net, or .edu.  The other, lower-level fields follow to the left of the TLD, separated by periods.  The first field to the left of the TLD is the Second Level Domain ("SLD"), followed by the Third Level Domain, and so on.  Thus, using the nytimes.com example, ".com" is the TLD, and "nytimes" is the SLD.  (There is no Third Level Domain in this example.)

24.     In order to link a domain name to an IP address, the DNS server must have access to the Root, which serves as the highest level of the DNS hierarchy and contains a "master list" of all the TLDs.  The Root enables the connection of domain names to IP addresses by first directing an Internet user's request to the appropriate TLD, which then routes the user to the desired host computer via the second (and possibly third or fourth) level domain.

25.     Currently, the number of TLDs (other than country code TLDs, discussed below) has been arbitrarily limited to twenty-two.  Upon information and belief, there are no financial, technical or other constraints to adding new TLDs to the current architecture of the Internet via access to the Root.

26.     A limited number of corporations and organizations operate these TLDs, and they must pay a fee to ICANN in order to do so.  These organizations and corporations are "wholesale" providers of TLDs—they sell the ability to register a domain name with a particular TLD and maintain a "zone file," or registry, of all the domain names associated with that TLD.  TLD wholesalers are commonly referred to as TLD "registries."

27.     The "retail" sellers of domain names, called "registrars," are companies that sell the second-level domain names directly to the companies and content providers that want to create a website or provide other services.  Registrars, such as "godaddy.com," must be approved by the TLD registries to sell domain names.

7

1   The "registrants"—individual companies and content producers, such as The New

2   York Times, that purchase a domain name through the registrar—rent that domain

3   name by paying an annual fee to the registrar.

4   28.    The TLD market is extremely lucrative, and, at present, is controlled by a

5   small group of industry insiders.  For example, wholesale TLD registries receive

6   approximately $5-7 per year for every domain name in that particular TLD registry.

7   Considering that there are over a hundred million websites using the ".com" TLD,

8   annual revenue for Verisign, Inc. ("Verisign")—the only ICANN-authorized .com

9   TLD registry—is approximately between $500 and $700 million.

10  29.    There are three different categories of TLDs:

11          (a)    Fourteen of the twenty-two TLDs are "sponsored top level domains"

12          ("sTLDs"), such as .gov and .edu, that are restricted to specific classes of

13          users who must meet a given criterion in order to register with them (*e.g.*, be

14          a U.S. government agency to receive a .gov domain, or be an accredited

15          educational institution to receive a .edu domain).

16          (b)    The other eight TLDs are "generic top level domains" ("gTLDs"),

17          such as .com and .net, that permit anyone to register.

18          (c)    Additionally, separate from the twenty-two TLDs controlled by

19          corporate entities, there are unique "country-code top level domains"

20          ("ccTLDs") that are operated by sovereign nations, or companies with the

21          authority to operate the TLD on behalf of those countries.  Each country or

22          designated entity with the authority to operate a ccTLD may set its own

23          registration restrictions and dictate the registration fee.

24  30.    Despite the limited number of available TLDs, there exists competition for

25  the most commercially "desirable" TLDs.  Consumers, for example, may be more

26  likely to trust an e-commerce site with a ".com" domain name, rather than a ".biz"

27  domain name.  The ".com" suggests a legitimacy that other TLDs may not have.

28  On information and belief, most Internet users expect that a website will use .com

8

ny-1023809

1  and reflexively append .com to particular content producer's trademarked brand

2  name when seeking access to that content producer's website.

3  31.  Additionally, there are no technological or legal reasons that might prevent a

4  gTLD registry from offering hundreds of gTLDS; as described below, this is, in

5  fact, name.space's business model.

6  **B.  name.space Begins Operating as a Registry.**

7  32.  In 1996, Paul Garrin, founder of name.space, established a network of

8  servers in five countries on two continents to provide a competing registry with that

9  of Network Solutions, Inc. ("Network Solutions"), which, in 1992, had been

10  granted exclusive control over the Root by the National Science Foundation

11  ("NSF"), a U.S. government agency.  In 1995, Network Solutions was permitted to

12  operate for profit as a TLD registry, and began charging fees to register domain

13  names on the Root's limited number of TLDs.

14  33.  In contrast to Network Solution's arbitrarily limited TLDs, name.space

15  offered over five hundred different and "expressive" TLDs, such as .art, .food,

16  .magic, .music, .now and .sucks.  Name.space's business model offered a wide

17  array of TLDs for content providers, allowing for increased consumer accessibility

18  to specific Internet sites, as well as stronger expressiveness, marketability and

19  branding.  For example, at the time, name.space's domain name in the Network

20  Solutions registry was "namespace.pgpmedia.com," while its domain name through

21  name.space's registry was simply "name.space" (where .space, rather than .com,

22  was the TLD).

23  34.  Unfortunately, name.space was effectively unable to compete with Network

24  Solutions because name.space's TLDs were not on the Root and therefore

25  segregated from the majority of the global Internet.  When an Internet user enters a

26  URL into his or her web browser, the web browser will by default look to the Root

27  to resolve that URL.  Only by changing the DNS settings on each individual's

28  computer with the IP addresses of name.space DNS resolvers, and bypassing the

9

1   DNS settings assigned by the user's service provider (which by default point to the

2   Network Solutions-controlled Root), can the URL resolve domain names in service

3   on name.space's registry.  Practically speaking, for 99.9% of the world, <u>the Root is</u>

4   <u>the Internet</u>.  Domain names under name.space's TLDs were by default not

5   universally resolvable on the Internet, thereby eliminating any chance of

6   name.space competing with Network Solutions, and enabling Network Solutions to

7   operate its government-granted monopoly with impunity.

8           **C.     ICANN Takes Over Management of the DNS on the Root.**

9   35.    In 1997, the U.S. government issued a report entitled "A Framework for

10  Global Electronic Commerce," which transferred control of Internet governance

11  from NSF to the Department of Commerce (the "DOC").  Soon after, the DOC

12  solicited comments from stakeholders and published a "white paper" that reflected

13  the commentators' consensus that a new, not-for-profit corporation should have the

14  exclusive authority to manage the DNS.

15  36.    In 1998, the DOC assigned ICANN the exclusive authority to manage the

16  DNS system.  According to the National Telecommunications and Information

17  Administration ("NTIA")—a division of the DOC that is responsible for

18  "promoting the stability and security" of the DNS "through its participation on

19  behalf of the U.S. government in Internet Corporation for Assigned Names and

20  Numbers (ICANN) activities"—ICANN "is the not-for-profit entity responsible for

21  coordinating the technical management of the Internet's domain name system

22  (DNS) and for ensuring its continued security, stability and integrity."   In reality,

23  ICANN has not been operating as a truly disinterested "not-for-profit entity."

24  37.    Pursuant to its agreements with the U.S. government, ICANN has the

25  exclusive authority to determine whether to introduce new TLDs into the Internet's

26  current architecture.  And, significantly, ICANN also has the exclusive authority to

27  determine what companies will operate as registries for these TLDs.

28

                                              10

38.     According to the U.S. government white paper that addresses ICANN's role as the government-sanctioned gatekeeper to the Internet, "[t]he new corporation [ICANN] does not need any special grant of immunity from the antitrust laws so long as its policies and practices are reasonably based on, and no broader than necessary to promote the legitimate coordinating objectives of the new corporation."

39.     Further, the white paper states that: "[a]pplicable antitrust law will provide accountability to and protection for the international Internet community.  Legal challenges and lawsuits can be expected within the normal course of business for any enterprise and the new corporation [ICANN] should anticipate this reality."

40.     Regarding the process by which ICANN determines what new TLDs to authorize, the white paper states that: "the decision making process would need to reflect a balance of interests and should not be dominated by any single interest category."

41.     Moreover, ICANN's "activities would need to be open to all persons who are directly affected by the entity, with *no undue financial barriers to participation* or unreasonable restrictions on participation."

42.     Similarly, a U.S. government "green paper" recognized that "the new corporation's [ICANN's] processes should be fair, open and pro-competitive.  Its decision-making processes should be sound and transparent."  The green paper also warns ICANN to guard against "capture by a self-interested faction."

43.     Far from being fair and open with no undue financial barriers to participation, the process leading to the 2012 application round has been shrouded in secrecy, with significant financial and administrative barriers to entry added since the 2000 process that conflict with ICANN's mandate.

44.     Upon information and belief, ICANN is controlled by a board of directors with significant conflicts of interest; the ICANN Board is comprised of industry insiders that seek to entrench their power to the detriment of the Internet

11

1   community and the general public.  ICANN Board members have close business

2   and financial connections with the existing TLD registries, as well as domain name

3   registrants.  These conflicts of interest have resulted in a commercial environment

4   that unlawfully insulates industry insiders, stifles competition and, as discussed

5   below, has precluded name.space from implementing its business model and

6   competing as a domain name registry.

7       **D.    ICANN Introduces a Limited Number of New TLDs and Grants**

8           **Only Industry Insiders the Authority to Operate as the New TLD**
            **Registries.**

9           **1.    The 2000 Application Round Opens.**

10  45.    In 2000, ICANN sought to expand the number of available TLDs and

11  adopted a policy for the introduction of new TLDs through an application process

12  (the "2000 Application Round").

13  46.    To be selected as a new TLD registry, applicants had to establish their ability

14  to provide the technical expertise necessary to operate a TLD, as well as their

15  financial and business management strengths.  The 2000 Application Round

16  instructions were approximately seven pages long.

17  47.    The application fee for the 2000 Application Round was $50,000, and

18  applicants could submit multiple TLD strings in a single application without paying

19  any additional fees.

20  48.    One of the stated goals of the 2000 Application Round was to "provide a

21  vehicle for providing a diverse range of concepts for innovative uses of the DNS."

22  ICANN emphasized that it was "seek[ing] diversity and hop[ing] to rely on the

23  creative approach of the applications to all aspects of the introduction and operation

24  of new TLDs."  ICANN encouraged applicants to "[b]e creative."

25          **2.    name.space Applies for 118 gTLDs.**

26  49.    After four years of efforts seeking inclusion of its TLDs into the Root

27  through administrative and legal means, name.space finally had a chance to add a

28

1  portion of its exclusive catalog of TLDs to the DNS and to begin competing with

2  other TLD registries.

3  50.    In 2000, as part of the 2000 Application Round, name.space submitted a

4  complete and timely application with ICANN to operate as the registry for 118

5  gTLDs, and paid the $50,000 application fee.  A full list of all 118 gTLDs from

6  name.space's 2000 Application is attached as Exhibit A.

7  51.    ICANN accepted name.space's 2000 Application, and in fact selected

8  name.space's 2000 Application as one of the "strong candidates" and one of the

9  top-ten applications submitted in the 2000 Application Round.

10  52.    Moreover, a former Chairperson of ICANN's board of directors, strongly

11  supported name.space's 2000 Application and stated that name.space represents

12  diversity and free speech on the Internet.  The former Chair also stated that

13  name.space would likely be a successful business that would support both

14  commerce and free speech.

15  53.    Notwithstanding the status and credentials of name.space's 2000 Application,

16  ICANN simply dragged its feet on making a determination.  ICANN never rejected

17  name.space's 2000 Application, but neither advanced name.space's 2000

18  Application for delegation nor awarded name.space the authority to operate any of

19  name.space's TLDs over the DNS.

20  54.    In fact, to this day, on information and belief, name.space's 2000 Application

21  is still pending.  As one ICANN committee member stated with respect to

22  name.space's 2000 Application, "we'll wait them out."

23  55.    Rather than delegating name.space's 118 gTLDs, ICANN ignored its own

24  mandates of "seeking diversity" and relying on creative approaches to the

25  introduction and operation of new TLDs, and instead approved only seven new

26  TLDs: the gTLDs .biz and .info and the sTLDs .aero, .coop, .museum, .name and

27  .pro.

28

13

56.     As Professor Milton Mueller of Syracuse University wrote in his 2004 book, *Ruling the Root*, "[a]dding the name.space TLDs to the [] root.zone would have transformed the commercial environment of the DNS.  As the only registry for hundreds of top-level domains, name.space would have been quickly elevated to the status of peer of Network Solutions ."

57.     Significantly, almost no new industry players emerged from the 2000 Application Round as TLD registries.  ICANN awarded the overwhelming majority—over 99%—of the "new" TLDs to existing dominant firms in the TLD and domain name registrar industries.

58.     In 2000, Verisign acquired Network Solutions, including Network Solutions' control of the .com, .net and .org TLDs.  Verisign's acquisition of Network Solutions added to its already significant TLD business:  Verisign also has the exclusive contracts to operate the .name and .gov sTLDs and the .cc and .tv ccTLDs.

**E.     ICANN Launches the 2012 Application Round for New TLDs While Placing Significant Barriers to Entry.**

59.     Since 2000, ICANN's policies and actions regarding the TLD market have come under increasing scrutiny from the Internet community, members of Congress and international agencies.

60.     ICANN has ties to and benefits from payments from the select few industry players that are able to operate domain name registries.  Such conflicts of interest have been widely reported.  Notably, ICANN's outgoing president and CEO has been quoted as stating: "ICANN must be able to act for the public good while placing commercial and financial interests in the appropriate context.  How can it do this if all top leadership is from the very domain name industry it is supposed to coordinate independently?"

61.     Upon information and belief, some of those conflicts include Chair Steve Crocker, who runs the consulting firm Shinkuro, which has a silent investment from

14

1   domain name registry provider Afilias Limited ("Afilias"), the owner of .org and

2   .info, and Vice-chair Bruce Tonkin, a senior executive with Melbourne IT, an

3   Australian company that has advertised its ability to help clients secure gTLD

4   registry accreditation from ICANN.  Ram Mohan, Afilias's Executive Vice

5   President and Chief Technology Officer, also sits on the ICANN board of directors.

6   Further, Peter Dengate Thrush, former Chairman of ICANN's board of directors, is

7   now the Executive Chairman of Top Level Domain Holdings, Inc., which filed

8   ninety-two applications for new gTLDs in 2012.

9   62.   Amidst this widespread criticism, ICANN opened a new round of

10   applications for TLD registries (the "2012 Application Round").  The application

11   window ran from January 12, 2012 through April 12, 2012.

12   63.   In a 2009 agreement with the DOC, ICANN emphasized that it would

13   "ensure that as it contemplates expanding the top-level domain space, the various

14   issues that are involved (including competition, consumer protection, security,

15   stability and resiliency, malicious abuse issues, sovereignty concerns, and rights

16   protection) will be adequately addressed prior to implementation."

17   64.   In contrast to the seven-page instruction manual from the 2000 Application

18   Round, the rules and procedures for the 2012 Application Round were set forth in a

19   massive 349-page guidebook.

20   65.   ICANN purports to operate by consensus.  In fact, ICANN's creation of the

21   2012 Application Round, its announcements regarding the 2012 Application Round

22   and the rules that ICANN adopted were the result of an unlawful series of

23   agreements between ICANN and its co-conspirators, some of whom had already

24   left ICANN and some of whom were in the ICANN organization when the 2012

25   Application Round was decided and announced, but thereafter left ICANN.

26   66.   Upon information and belief, ICANN and the co-conspirators entered into

27   and furthered their conspiracy on at least the following occasions:

28       -   March 12, 2010:  the ICANN board of directors met in Nairobi, Kenya;

15

1     - September 24, 2010:  a special meeting of the ICANN board of directors

2        was held in Trondheim, Norway;

3     - October 28, 2010:  a special meeting of the ICANN board of directors was

4        held via teleconference;

5     - December 10, 2010:  the ICANN board of directors met in Brussels,

6        Belgium;

7     - January 25, 2011:  a special meeting of the ICANN board of directors was

8        held via teleconference;

9     - March 18, 2011:  the ICANN board of directors met in San Francisco,

10       California;

11    - October 11, 2011:  a special meeting of the ICANN board of directors was

12       held in Santa Monica, California;

13    - October 28, 2011:  the ICANN board of directors met in Dakar, Senegal;

14    - December 8, 2011:  a special meeting of the ICANN board of directors

15       was held via teleconference.

16  67.   In order to apply in the 2012 Application Round, ICANN required applicants

17  to pay a whopping $185,000 per TLD fee—over three times more than the 2000

18  Application Round's $50,000 fee.  More importantly, unlike the 2000 Application

19  Round, ICANN forbid applicants from submitting multiple TLD strings in the same

20  application.

21  68.   Therefore, had name.space re-applied in the 2012 Application Round for

22  delegation of the same 118 gTLDs that remain pending from name.space's 2000

23  Application, it would have cost name.space almost $22 million, more than 436

24  times the price of name.space's 2000 Application for the same 118 gTLDs.

25  69.   Upon information and belief, the 2012 Application Round, by requiring

26  application fees for each TLD for which an application has been submitted, was

27  designed intentionally to preclude or at least impede name.space's business

28  model—which incorporates the simultaneous operation of a significant number of

16

ny-1023809

1   gTLDs.  Indeed, name.space appears to be uniquely situated in this regard as its

2   2000 Application contains 118 gTLDs already in service that predate the ICANN

3   application process and the formation of ICANN itself.

4   70.     In a transparent attempt to avoid the conflict between the pending 2000

5   applications and the new, more expensive 2012 applications, ICANN offered a one-

6   time $86,000 reduction in the application fee for the 2012 Application Round for

7   those applicants that previously applied in 2000, but whose TLDs were not

8   delegated into the Root.  This fee reduction could only be used for a single TLD

9   application.  If the applicant chose to accept this one-time fee reduction, it would

10  waive any claim it had to its 2000 application.  Otherwise, the 349-page guidebook

11  did not mention how ICANN would treat any previous applicants from the 2000

12  Application Round whose applications, like name.space's, are still pending.

13  71.     In addition, in the 2012 Application Round, ICANN instituted a binding

14  dispute resolution process to resolve any conflicts with regard to a 2012

15  application.  Upon information and belief, ICANN is attempting to use the 2012

16  Application Round to force previous applicants from the 2000 Application Round

17  to submit to this new dispute resolution process.

18  72.     Further, ICANN did not prevent 2012 applicants from applying for

19  delegation of TLDs that were already included in other applicants' pending 2000

20  applications.

21  73.     Upon information and belief, ICANN knowingly and willingly created the

22  application process for the 2012 Application Round without adequate safeguards in

23  place to protect the 2000 applicants' rights in their proposed or already operating

24  TLDs.

25  74.     Upon information and belief, it costs as much or more to apply for one gTLD

26  string in the 2012 Application Round than it does to launch a TLD registry in the

27  market.

28

17

75.   As a result of the 2012 Application Round's procedural and financial barriers created by ICANN, name.space was unable to participate in the 2012 Application Round, and continues to seek delegation of its 118 gTLDs from its 2000 Application.

76.   Instead of structuring the 2012 Application Round to foster innovation and competition, ICANN's imposition of procedural and financial hurdles created a process in which only industry insiders—such as former ICANN board of directors Chairman Peter Dengate Thrush—and industry behemoths, including some of the world's largest technology companies, can realistically hope to get their applied-for gTLDs delegated to the Root.

### F.   ICANN's Power in the Relevant Markets

77.   The actions of ICANN and the co-conspirators, described above, have had anticompetitive effects in the international market to act as a gTLD registry with access to the DNS (the "TLD registry market"). The TLD registry market also includes the potential market for gTLD registries with access to the DNS that offer multiple gTLD strings.

78.   The market to act as a gTLD registry with access to the DNS is a unique and separate market because there is no reasonable substitute for it. The overwhelming majority of Internet users access content online through websites registered with TLDs that have access to the DNS and through e-mail services that are entirely dependent on the DNS. Further, all consumer and commercial Internet connections by default point to the ICANN-controlled DNS such that only TLDs controlled by ICANN are accessible. Put differently, in order for a potential gTLD registry to provide its services to consumers on what is commonly known as the Internet, access to the DNS is necessary. And without access to the DNS—access that is controlled by ICANN and the co-conspirators—a potential gTLD registry cannot enter the market to create and operate new gTLDs on the Internet despite consumer demand for new, unique gTLDs.

18

ny-1023809

79.     In addition, the actions of ICANN and the co-conspirators have had anticompetitive effects in the international market for domain names.   Content creators and other consumers that purchase domain names are limited to "shopping" for second-level domain names because they effectively have no choice among the few available gTLDs.  But absent ICANN's anticompetitive acts, there would exist separate markets for both the selection of TLDs *and* for second-level domains. Consumers recognize this and are beginning to demand more choice in gTLDs and, in particular, more expressive options.  ICANN and the co-conspirators, however, continue to dictate the supply of TLDs, with resulting anticompetitive effects in the market for domain names.

80.     Finally, the actions of ICANN and the co-conspirators have had anticompetitive effects in the market for blocking or defensive registrations services.  ICANN's and the co-conspirator's current business model thrives on permitting a select group of TLD registries to extract monopoly rents in the market for defensive registrations by granting each TLD registry the exclusive right to operate a given TLD.  In order for content creators and trademark owners to protect their brand and/or marks, they must "defensively" register with multiple TLDs or risk that their brand and/or mark could become diluted, confused with other marks/content, or associated with something undesirable.  ICANN and the co-conspirators permit some TLD registries to do essentially nothing but extract profit. There is no need for these TLD registries to provide services because a "defensively" registered website is not intended to be actively run by the content creator; the sole reason to defensively register is to protect a brand and/or mark. Further, even though a TLD registry may operate a TLD for which there is little demand, such as .biz, it can still reap monopoly profits by forcing content creator to register with that TLD or risk harm to their brand and/or mark.   Because ICANN and the co-conspirators control the supply of TLDs, they prevent other players from

19

ny-1023809

entering the market and offering a different models for brand and trademark protection.

### G.   ICANN Is Seeking to Delegate TLDs in Violation of name.space's Trademark Rights.

81.   name.space has originated at least 482 gTLDs, which it has been using in commerce to promote name.space's services continuously since 1996.  A list of the 482 gTLDs belonging to name.space is attached as Exhibit B.

82.   name.space has been using the 482 gTLDs at issue to promote name.space by making them available for registration and resolution, among other services, to those users who choose to operate on name.space's network.  Those users, as a result, identify and associate those gTLDs with name.space and its services, and name.space has trademark rights in those gTLDs.

83.   While the U.S. Patent and Trademark Office ("USPTO") regards TLDs as generally serving no source-indicating function, the USPTO has recognized that "[a]s the number of available TLDs is increased by the Internet Corporation for Assigned Names and Numbers ("ICANN"), or if the nature of new TLDs changes, the examining attorney must consider any potential source-indicating function of the TLD and introduce evidence as to the significance of the TLD."  The USPTO has thus explicitly recognized that TLDs could, in fact, serve source-indicating functions.

84.   The USPTO's prior stance on the function of TLDs as generally not being source indicating is a relic of an essentially exclusive ".com" era, which is rapidly coming to an end.  In other words, using the USPTO's logic, if a brand owner has a trademarked name, the trademark covers both "brand" and "brand.com," because .com does not add any source indicating function, it is merely the common parlance for a company's website.  Today, however, a brand owner can go to name.space and register "brand.now" or "brand.power," or a competitor or commentator can register "brand.sucks"—all recognizable as name.space's gTLDs.  While ".com"

20

1   still dominates the gTLD market, it is by no means the only possible gTLD.

2   Notwithstanding the hurdles to TLD competition created by ICANN, name.space

3   uses its trademarked gTLDs to compete with other registries in the gTLD market.

4   85.    Regardless of the USPTO's position on federal trademark registration for

5   TLDs—which notably is at odds with policies of other countries—name.space has

6   acquired common law trademark rights in its gTLDs.

7   86.    Accordingly, name.space's 482 gTLDs—such as .now, .power, .space and

8   .sucks, to name a few—would be infringed by competing gTLDs delegated under

9   the same name.

10   87.    Indeed, applicants in the 2012 Application Round have applied for TLDs that

11   are among the 482 gTLDs that name.space has operated and promoted continuously

12   since 1996 and in which name.space has exclusive trademark rights.

13   88.    On June 13, 2012, ICANN announced that applications had been filed to

14   have 189 gTLDs that have resolved on the name.space network continuously since

15   1996 delegated on the DNS.  The list of gTLDs that were applied for in the 2012

16   Application Round and that are currently being operated and promoted by

17   name.space on the name.space network include: .art, .blog, .book, .casino, .design,

18   .home, .inc, .movie, .shop and .sucks.  A complete list is attached hereto as

19   Exhibit C.

20   89.    Upon information and belief, ICANN intends to delegate certain of these

21   gTLDs to 2012 applicants, in violation of name.space's trademark rights.

22   90.    ICANN's refusal to delegate name.space's gTLDs to the DNS under its 2000

23   Application has enabled and induced 2012 applicants to apply for delegation of

24   those gTLDs as part of the 2012 Application Round.  Without ICANN's consent

25   and support, those 2012 applicants would be unable to apply for and receive

26   delegation of name.space's trademarked gTLDs.  ICANN in turn receives

27   substantial application fees from these applicants and benefits from any prospective

28   infringement.

91.     Moreover, name.space currently provides services to websites and various network services in operation on the Internet that use domains under its gTLDs. Any delegation by ICANN of those gTLDs to others will therefore cause disruption to name.space's existing services and to the content on its network, not to mention confusion as to where each gTLD in conflict resolves.

92.     name.space has notified ICANN of the existence of this potential conflict and disruption, and about name.space's existing and prospective contractual relationships with its customers regarding name.space's gTLDs.  As a result, ICANN is well aware of the disruption that its actions have caused and will cause.

93.     Given name.space's priority in first establishing those gTLDs and providing services thereto, any conflicting delegation by ICANN would amount to interference with name.space's services and its relationships with existing and prospective customers.

## FIRST CLAIM FOR RELIEF

**(Contract, Combination or Conspiracy in Restraint of Trade under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)**

94.     Plaintiff hereby realleges and incorporates by reference as though fully set forth herein each and every allegation in the paragraphs above.

95.     ICANN has entered into a conspiracy that includes current and former members of ICANN's board of directors, Verisign, Afilias and the select few other companies that operate as TLD registries (the "co-conspirators").

96.     The conspiracy that exists between ICANN, the co-conspirators, and the current TLD registries exists, in part, because members of ICANN's board of directors have known, vested interests in the economic performance of the TLD registries.  By way of example, and as set forth above, a "revolving door" exists where members of ICANN's board of directors leave ICANN to work for a TLD registry and vice versa.

22

ny-1023809

97.    ICANN and the co-conspirators have worked in concert to structure the 2012 Application Round to ensure that the current TLD registries continue to dominate the TLD registry market and to deter other potential market entrants, for example, by charging a prohibitively high fee to submit an application.

98.    By and through this conspiracy, ICANN and the TLD registries intend to limit competition to the TLD registry market in order to retain their dominant market positions.  In addition, ICANN has precluded the creation of a market for the sale of registrations of multiple TLD strings.

99.    As a result of ICANN's conspiracy, consumers have few choices in the market for domain names, and, in particular, they have virtually no choices for "expressive" TLDs, such as those offered by name.space.

100.    Another result of ICANN's conspiracy is that the price of registering a TLD is artificially high.  Additionally, content producers must spend enormous amounts of money to "defensively" register domain names under separate TLDs to protect their brands.

101.    Further, ICANN has conspired to administer the DNS in a way that prevents name.space's business model from entering the international market operation as a TLD registry.

102.    By and through this conspiracy, ICANN imposed rules in the 2012 Application Round that prevent name.space's business model from competing as a TLD registry.

103.    There is no legal, business or technological rationale for the rules imposed by ICANN in its administration of the DNS or in the 2012 Application Round.  In fact, on information and belief, ICANN could easily "interconnect" name.space and other networks to ICANN's DNS, which would dramatically increase competition in the relevant markets.

104.    name.space has spent over sixteen years developing a business plan to serve the needs of domain name registrants.  By making that business approach

1  impossible—to the benefit of ICANN and its co-conspirators—name.space was

2  precluded from entering and competing in this market.

3  105.  Because of ICANN's conspiracy, name.space has lost millions of dollars in

4  potential revenue.

5  **SECOND CLAIM FOR RELIEF**

6  **(Monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)**

7  106.  Plaintiff hereby realleges and incorporates by reference as though fully set

8  forth herein each and every allegation in the paragraphs above.

9  107.  ICANN controls access to the Root—it is the sole and exclusive authority in

10  charge of the DNS.  By managing the DNS and controlling access to the Root,

11  ICANN effectively controls access to the public Internet.

12  108.  It is not reasonable or practical to duplicate management of the DNS.

13  109.  Through its exclusive authority to manage the DNS, ICANN is the sole entity

14  that determines whether to admit new TLDs into the DNS by allowing TLD

15  registries access to the Root.  ICANN alone has the power to determine what

16  companies will operate as registries for TLDs that are universally resolvable on the

17  public Internet.

18  110.  No federal agency has the power to compel ICANN to provide TLD

19  registries with access to the Root, or to compel ICANN to award private companies

20  with contracts to operate as TLD registries.

21  111.  Absent access to the Root, it is impossible for a potential TLD registry to

22  enter the TLD market.

23  112.  ICANN uses its control over access to the Root in order to eliminate

24  competition from the relevant markets.

25  113.  Specifically, ICANN's control over access to the Root has, and continues to

26  have, the effect of preventing name.space from competing in the TLD registry

27  market.  Indeed, ICANN's actions, as set forth above, indicate that it has structured

28

24

1    the 2012 Application Round to prevent name.space from competing in the TLD

2    registry market.

3    114.   Upon information and belief, ICANN has restricted, and continues to restrict,

4    access to the Root in order to enrich current and former members of the ICANN

5    board of directors that have close ties with the extremely small number of TLD

6    registries that currently have access to the Root.

7                        **THIRD CLAIM FOR RELIEF**

8    **(Unlawful Restraint of Trade and Conspiracy in Restraint of Trade Under the**
9    **Cartwright Act, California Business and Professions Code §§ 16720 et seq.)**

10   115.   Plaintiff hereby realleges and incorporates by reference as though fully set

11   forth herein each and every allegation in the paragraphs above.

12   116.   ICANN and the co-conspirators have conspired to and acted in concert

13   unlawfully to restrain and eliminate competition in the relevant markets, as

14   described above in paragraphs 94-105, in violation of the Cartwright Act, California

15   Business & Professions Code sections 16720 *et seq.*

16   117.   Because of ICANN's and the co-conspirator's unlawful actions under the

17   Cartwright Act, name.space has lost millions of dollars of potential revenue.

18   118.   Under this claim for relief, name.space is entitled to recovery of its attorneys'

19   fees and costs under California Business and Professions Code Section 16750(a).

20                       **FOURTH CLAIM FOR RELIEF**

21   **(Unfair Competition and False Designation of Origin under Section 43 of the**
22   **Lanham Act, 15 U.S.C. § 1125(a))**

23   119.   Plaintiff hereby realleges and incorporates by reference as though fully set

24   forth herein each and every allegation in the paragraphs above.

25   120.   Since 1996, name.space has operated and promoted, and continues to operate

26   and promote, 482 gTLDs in commerce through its own network.  A list of these

27   482 gTLDs is attached hereto as Exhibit B.

28

25

121.   name.space has rights in its inherently distinctive gTLDs in connection with its operation and promotion of a TLD registry and related services.  These rights predate ICANN and the 2012 Application Round.

122.   Since at least 1996, name.space has promoted and marketed its TLD registry services in the United States using the gTLD trademarks.  name.space has expended substantial sums of money to build, maintain and enhance the reputation of its registry services.

123.   ICANN's willingness to allow competing TLD registries to use the identical gTLDs in commerce on the ICANN-controlled DNS, in exchange for substantial fees that these registries pay to ICANN for such use, is likely to cause confusion as to the origin of these gTLDs and is likely to cause consumers to believe that these gTLDs are associated with name.space's competitors, rather than with name.space, and/or that there is a relationship between name.space and ICANN or name.space and its competitors.

124.   ICANN's actions complained of herein are likely to cause confusion, mistake or deception among consumers as to an affiliation, connection or association between name.space and its gTLDs and name.space's competitors and their identical gTLDs, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

125.   Alternatively and in addition, ICANN's exclusive control over which TLDs are delegated to the DNS, as well as its intentional inducement of prospective TLD registries to use name.space's gTLDs, without name.space's consent, in connection with TLD registry services, constitutes contributory infringement in violation of Section § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

126.   Alternatively and in addition, ICANN's symbiotic partnership with competing TLD registries in its willingness to delegate infringing TLDs to the DNS in exchange for substantial application fees subjects ICANN to vicarious liability under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

ny-1023809

127.   ICANN's unauthorized conduct has deprived and will continue to deprive name.space of the ability to control its gTLDs and consumers' perception with regard to those gTLDs.

128.   Allowing prospective domain name registries, including name.space's competitors, to apply for the unauthorized use of name.space's gTLDs on the ICANN-controlled DNS has enabled and will continue to enable ICANN to earn profits to which it is not in equity or good conscience entitled and has unjustly enriched ICANN at name.space's expense, all to ICANN's profit and name.space's detriment.

129.   Because ICANN has refused to cease its infringing and unlawful conduct despite repeated requests by name.space, ICANN has acted willfully.

130.   As a direct and proximate result of these acts, ICANN has profited and will continue to profit from the strength of name.space's gTLD trademarks, and name.space has been and will continue to be damaged by ICANN's acts, all in an amount to be determined at trial.

131.   As a result of ICANN's conduct, name.space has suffered and/or will suffer substantial damage and irreparable harm, loss and injury to its gTLD trademarks and to name.space's business and goodwill, constituting an injury for which name.space has no adequate remedy at law.  Unless this Court enjoins ICANN's conduct, name.space will continue to suffer irreparable harm.

## **FIFTH CLAIM FOR RELIEF**

### **(Common Law Trademark Infringement)**

132.   Plaintiff hereby realleges and incorporates by reference as though fully set forth herein each and every allegation in the paragraphs above.

133.   Since 1996, name.space has operated and promoted, and continues to operate and promote, 482 gTLDs in commerce through its own network.  A list of these 482 gTLDs is attached hereto as Exhibit B.

27

134.   name.space has common law rights in the inherently distinctive gTLDs used in connection with its operation and promotion of TLD registry services.  These rights predate any other use of these gTLDs in connection with TLD registry services.

135.   Since at least 1996, name.space has promoted and marketed name.space's TLD registry services in the United States using these gTLD trademarks. name.space has expended substantial sums of money to build, maintain and enhance the reputation of its registry services.

136.   ICANN's willingness to allow competing TLD registries to use the identical gTLDs in commerce on the ICANN-controlled DNS, in exchange for substantial fees that these registries pay to ICANN for such use, is likely to cause confusion as to the origin of these gTLDs and is likely to cause consumers to believe that these gTLDs are associated with name.space's competitors, rather than with name.space, and/or that there is a relationship between name.space and ICANN or name.space and its competitors, and thus constitutes common law trademark infringement.

137.   Alternatively and in addition, ICANN's exclusive control over which TLDs are delegated to the DNS, as well as its intentional inducement of prospective TLD registries to use name.space's gTLDs, without name.space's consent, in connection with TLD registry services, constitutes contributory trademark infringement.

138.   Alternatively and in addition, ICANN's symbiotic partnership with competing TLD registries in its willingness to delegate infringing TLDs to the DNS in exchange for substantial application fees subjects ICANN to vicarious liability for trademark infringement.

139.   ICANN's unauthorized conduct has deprived and will continue to deprive name.space of the ability to control its gTLDs and consumers' perception with regard to those gTLDs.

140.   Allowing prospective domain name registries, including name.space's competitors, to apply for the unauthorized use of name.space's gTLDs on the

28

1    ICANN-controlled DNS has enabled and will continue to enable ICANN to earn

2    profits to which it is not in equity or good conscience entitled and has unjustly

3    enriched ICANN at name.space's expense, all to ICANN's profit and name.space's

4    detriment.

5    141.    Because ICANN has refused to cease its infringing and unlawful conduct

6    despite repeated requests by name.space, ICANN has acted willfully.

7    142.    As a direct and proximate result of these acts, ICANN has profited and will

8    continue to profit from the strength of name.space's gTLD trademarks, and

9    name.space has been and will continue to be damaged by ICANN's acts, all in an

10   amount to be determined at trial.

11   143.    As a result of ICANN's conduct, name.space has suffered and/or will suffer

12   substantial damage and irreparable harm, loss and injury to its gTLD trademarks

13   and to name.space's business and goodwill, constituting an injury for which

14   name.space has no adequate remedy at law.  Unless this Court enjoins ICANN's

15   conduct, name.space will continue to suffer irreparable harm.

16                          **SIXTH CLAIM FOR RELIEF**

17   **(Unfair Competition under California Business and Professions Code § 17200)**

18   144.    Plaintiff hereby realleges and incorporates by reference as though fully set

19   forth herein each and every allegation in the paragraphs above.

20   145.    As set forth above, ICANN's conduct, including the manner in which it

21   structured the 2012 Application Round, constitutes an unlawful business act or

22   practice in that it violates Federal antitrust laws as set forth in Sections 1 and 2 of

23   the Sherman Act, as well as Section 43(a) of the Lanham Act and common law

24   rights.  In particular:

25          (a)    ICANN has violated Section 1 of the Sherman Act by conspiring to

26          limit competition to the market for the sale of TLDs and by administering

27

28

                                       29

the DNS in a way that prevents certain business models from competing as TLD registries;

(b)    ICANN has violated Section 2 of the Sherman Act by monopolizing the Root and using its control over access to the Root to eliminate competition from the market;

(c)    ICANN has violated Section 43(a) of the Lanham Act and common law trademark rights by allowing name.space's competitors to use on the ICANN-controlled DNS the gTLDs that name.space originated and has operated and promoted since 1996, in exchange for substantial fees that these competitors pay to ICANN for such use, which is likely to cause confusion as to the origin of these gTLDs and is likely to cause consumers to believe that these gTLDs are associated with name.space's competitors, rather than with name.space, and/or that there is a relationship between name.space and ICANN or name.space and its competitors.

146.    In addition, ICANN's business acts, including but not limited to the way in which ICANN erected financial and administrative barriers to entry in the 2012 Application Round, constitute unfair business acts or practices and illustrate a desire to exclude potential market entrants, and in particular name.space, from operating as a TLD registry.  The conduct alleged herein threatens an incipient violation of the antitrust laws.  The conduct alleged herein also violates the policy or spirit of the antitrust laws because its effects are comparable to or the same as a violation of the law, and it otherwise significantly threatens or harms consumers and harms competition.

147.    As further set forth above, ICANN's conduct in allowing name.space's competitors to use on the ICANN-controlled DNS the gTLDs that name.space originated and has operated and promoted since 1996, in exchange for substantial fees that these competitors pay to ICANN for such use, constitutes a deceptive business practice because such practice is likely to deceive a reasonable consumer

30

1   as to the origin of these gTLDs and as to whether these gTLDs are associated with

2   name.space's competitors rather than with name.space, as well as to deceive a

3   reasonable consumer as to the relationship between name.space and ICANN or

4   name.space and its competitors.

5   148.   ICANN's unlawful, unfair and/or deceptive business practices have caused,

6   and will continue to cause, injury in fact to name.space and loss of money or

7   property in an amount to be determined at trial.

8   149.   In addition, ICANN's unlawful, unfair and/or deceptive business practices

9   have caused, and unless restrained and enjoined by this Court, will continue to

10   cause irreparable harm, loss and injury to name.space for which name.space has no

11   adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

150.   Plaintiff hereby realleges and incorporates by reference as though fully set

forth herein each and every allegation in the paragraphs above.

151.   Since 1996, name.space has invested substantial time, skill and money in

developing and promoting the TLDs that name.space operates, promotes and

services on the name.space network.

152.   ICANN has exclusive control over whether name.space's gTLDs are

delegated to the Root and therefore available to be accessed through the public

Internet.

153.   Rather than delegate name.space's gTLDs to the Root pursuant to

name.space's 2000 Application, ICANN has instead allowed those gTLDs to be

controlled by any third party willing to pay $185,000 to ICANN, notwithstanding

the time and effort name.space has invested in these gTLDs since 1996.

154.   In doing so, ICANN has effectively misappropriated name.space's gTLDs at

little or no cost, and without name.space's authorization or consent.

31

155.   To the contrary, name.space has explicitly notified ICANN that the 482 gTLDs that name.space originated and has operated and promoted for over fifteen years were the exclusive property of name.space.

156.   Upon information and belief, ICANN has received substantial application fees from third-parties for ICANN to delegate name.space's gTLDs to the Root, to be controlled by those third parties.  ICANN should be ordered to account for and pay over to name.space all gains, profits and advantages derived by ICANN from the acts complained of herein.

157.   The aforesaid acts have also caused, and are likely to continue to cause, injury to the public and to name.space's sales and business reputation.

158.   ICANN's aforesaid acts have caused, and will continue to cause, damage to name.space in an amount to be determined at trial and, unless and until restrained and enjoined by this Court, will continue to cause irreparable harm, loss and injury to name.space for which name.space has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

### (Tortious Interference with Contract)

159.   Plaintiff hereby realleges and incorporates by reference as though fully set forth herein each and every allegation in the paragraphs above.

160.   name.space maintains contractual relationships with its customers, who purchase name.space's services, including the ability to register a domain name on name.space's network using any of the 482 gTLDs that name.space operates and promotes.

161.   Upon information and belief, ICANN knows of name.space's contracts with its customers to provide and manage domain names that resolve on name.space's network.

162.   ICANN has intentionally and knowingly interfered with name.space's existing customer contracts by permitting prospective TLD registries, including

32

name.space's competitors, to apply for delegation to the DNS of the same gTLDs that are the subject of name.space's existing customer contracts  Any delegation of name.space's gTLDs to other TLD registries by ICANN will result in the same gTLD being operated on both the ICANN-controlled DNS *and* name.space's network.

163.   Accepting such applications—not to mention granting any such applications—has disrupted and interfered with, and will continue to disrupt and interfere with, name.space's ability to fulfill its contractual obligations and provide content and services to its customers.

164.   name.space has been damaged by ICANN's intentional interference in an amount to be determined at trial.

165.   In addition, ICANN should be enjoined from delegating to the DNS any of the 482 gTLDs that name.space originated and currently operates and which are the subject of name.space's existing customer contracts, or name.space will suffer harm for which there is no adequate remedy at law.

## NINTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage)

166.   Plaintiff hereby realleges and incorporates by reference as though fully set forth herein each and every allegation in the paragraphs above.

167.   name.space maintains relationships with prospective customers to provide name.space's services, using any of the 482 gTLDs that name.space operates and promotes, once those gTLDs have been delegated to the Root.  These relationships are likely to provide future economic benefit to name.space.

168.   Upon information and belief, ICANN knows of name.space's relationships with its prospective customers to provide and manage domain names that resolve on the Root.

33

ny-1023809

169.   Knowing of name.space's relationships with its customers—and the possibility that name.space could attract even more customers if allowed access to the Root—ICANN wrongfully and intentionally structured the 2012 Application Round to include significant financial and administrative hurdles designed to exclude name.space from the market for TLDs on the Root.

170.   As a result, ICANN has interfered, and threatens to continue to interfere, with name.space's existing and prospective customers by denying name.space access to the Root.

171.   ICANN's interference is the proximate cause of name.space's inability to offer its catalog of TLDs on the public Internet resulting damages to name.space in an amount to be determined at trial.

172.   In addition, ICANN should be enjoined from delegating to the ICANN-controlled DNS any of the 482 gTLDs that name.space originated and continues to operate and which are the subject of name.space's existing and prospective economic relationships, or name.space will suffer harm for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE name.space prays for judgment as follows:

A.     Declaring that ICANN is liable for: violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; violation of the Cartwright Act, California Business and Professions Code Sections 16720 *et seq.*; violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement; violation of the California Unfair Competition Act, California Business and Professions Code Sections 17200 *et seq.*; common law unfair competition; tortious interference with contract; and tortious interference with prospective economic advantage;

34

1        B.      Awarding damages in favor of name.space against ICANN for all

2  damages sustained as a result of ICANN's wrongdoing, including prejudgment and

3  post-judgment interest, in an amount to be proven at trial;

4        C.      Awarding injunctive relief in favor of name.space against ICANN as

5  more particularly averred above;

6        D.      Awarding name.space reasonable costs and expenses incurred in this

7  action, including attorneys' fees and costs; and

8        E.      Such other legal and equitable relief as may be available and as the

9  Court deems just and proper.

## JURY DEMAND

10

11        Plaintiff name.space, Inc. hereby demands a trial by jury on all issues so

12  triable.

13

14  Dated:  October 10, 2012                    MORRISON & FOERSTER LLP

15

16                                     By: _____

17                                          Michael B. Miller
                                            Craig B. Whitney
                                            Adam J. Hunt
18                                          Mark R. McDonald

19                                          Attorneys for Plaintiff
                                            NAME.SPACE, INC.

20

21

22

23

24

25

26

27

28

                                    35

# EXHIBIT A

**name.space's 118 gTLDs from 2000 ICANN gTLD Application**

| | | | |
|---|---|---|---|
| .ads | .fashion | .men | .society |
| .agency | .festival | .monitor | .software |
| .aids | .fiction | .movie | .solutions |
| .air | .film | .music | .sound |
| .antiques | .films | .news | .soup |
| .art | .foundation | .now | .space |
| .artists | .free | .nyc | .sports |
| .auction | .fun | .one | .star |
| .audio | .fund | .online | .studios |
| .bbs | .funds | .opera | .sucks |
| .books | .gallery | .page | .systems |
| .cafe | .games | .partners | .tech |
| .cam | .gay | .people | .temple |
| .card | .graphics | .planet | .theater |
| .cars | .group | .politics | .time |
| .center | .guide | .power | .times |
| .channel | .help | .productions | .toys |
| .church | .history | .projects | .trade |
| .city | .hotel | .properties | .travel |
| .club | .index | .radio | .voice |
| .commerce | .insurance | .records | .war |
| .computers | .jazz | .school | .watch |
| .consulting | .jobs | .security | .weather |
| .culture | .lab | .service | .women |
| .design | .mad | .sex | .world |
| .digital | .mag | .shareware | .writer |
| .direct | .magic | .shoes | .zine |
| .dtv | .mail | .shop | .zone |
| .dvd | .market | .show | |
| .factory | .media | .site | |

# EXHIBIT B

The gTLDs contained in this publication are the exclusive Service Marks of
Name.Space 1996-2012 All Rights Reserved

| | | | |
|---|---|---|---|
| .academy | .bug | .culture | .finance |
| .access | .business | .cyber | .firm |
| .ads | .buy | .daily | .fish |
| .africa | .cable | .data | .flow |
| .age | .cafe | .day | .flux |
| .agency | .cam | .design | .folks |
| .aids | .camera | .dictionary | .food |
| .air | .camp | .digit | .form |
| .airlines | .canada | .digital | .forum |
| .alley | .capital | .dimension | .foundation |
| .almanac | .card | .dir | .free |
| .amor | .care | .direct | .fringe |
| .anarchy | .cars | .disc | .fuck |
| .antiques | .casino | .dish | .fun |
| .aps | .center | .dog | .fund |
| .arch | .central | .down | .funds |
| .art | .centre | .dtv | .funk |
| .artists | .channel | .dvd | .gallery |
| .arts | .chaos | .east | .game |
| .associates | .chapel | .easy | .games |
| .auction | .chat | .electric | .garden |
| .audio | .church | .elite | .gate |
| .band | .cigarettes | .email | .gay |
| .bank | .cigars | .enterprises | .geek |
| .bar | .circle | .entertainment | .general |
| .bbs | .city | .ephemera | .girl |
| .beat | .club | .erotic | .girls |
| .beer | .code | .erotica | .global |
| .bicycle | .coffee | .estate | .golf |
| .bicycles | .collectables | .etc | .governor |
| .big | .college | .exchange | .graphics |
| .bird | .comics | .express | .green |
| .black | .comix | .factory | .grey |
| .blog | .commerce | .facts | .group |
| .blue | .computer | .fair | .growth |
| .body | .computers | .family | .guard |
| .book | .computing | .faq | .guide |
| .books | .congress | .farm | .guitar |
| .box | .connection | .fashion | .guitars |
| .boys | .construction | .fax | .hack |
| .brain | .consulting | .fellowship | .hacker |
| .brand | .cool | .festival | .hair |
| .broker | .corp | .fiction | .handbook |
| .bros | .country | .film | .hard |
| .brown | .creations | .films | .hat |
| .budapest | .cult | .filter | .hell |

The gTLDs contained in this publication are the exclusive Service Marks of
Name.Space 1996-2012 All Rights Reserved

| | | | |
|---|---|---|---|
| .help | .lives | .multimedia | .pool |
| .history | .llc | .music | .pop |
| .hole | .llp | .mutual | .porno |
| .home | .logic | .nation | .port |
| .hope | .logo | .network | .post |
| .host | .loop | .networks | .power |
| .hot | .lotto | .news | .presence |
| .hotel | .loud | .next | .president |
| .hotline | .love | .ngo | .press |
| .hour | .lover | .night | .privacy |
| .house | .lp | .noise | .private |
| .icon | .ltd | .north | .productions |
| .illusions | .mad | .nostalgia | .products |
| .illustrated | .mag | .not | .projects |
| .image | .magazine | .noticias | .properties |
| .impact | .magic | .now | .pub |
| .inc | .magnetics | .null | .public |
| .indeed | .mail | .nuts | .publicadvocate |
| .index | .mall | .nyc | .publications |
| .indigo | .man | .objects | .punk |
| .inn | .manifesto | .ocean | .radikal |
| .inside | .map | .oil | .radio |
| .institute | .market | .one | .reality |
| .insurance | .mars | .online | .realty |
| .internet | .materials | .open | .record |
| .irc | .matrix | .opera | .records |
| .islands | .mayor | .ops | .red |
| .jam | .med | .orange | .reflector |
| .jazz | .media | .out | .report |
| .jet | .medical | .outside | .reporter |
| .jewelry | .medium | .page | .republic |
| .jobs | .memorabilia | .paper | .resources |
| .journal | .men | .partner | .review |
| .kids | .metal | .partners | .ride |
| .lab | .mind | .peace | .right |
| .label | .minds | .people | .rights |
| .labs | .mission | .perfect | .road |
| .lava | .model | .photo | .rock |
| .law | .models | .pictures | .roots |
| .left | .monde | .place | .rough |
| .library | .money | .planet | .run |
| .lie | .monitor | .play | .said |
| .limited | .moon | .plaza | .sale |
| .link | .motors | .pleasures | .sands |
| .list | .movie | .poets | .sauna |
| .lit | .movies | .politics | .say |

38

The gTLDs contained in this publication are the exclusive Service Marks of
Name.Space 1996-2012 All Rights Reserved

| | | | |
|---|---|---|---|
| .scan | .south | .texte | .views |
| .scape | .spa | .theater | .violet |
| .school | .space | .theatre | .vision |
| .scifi | .speech | .thing | .vlog |
| .secret | .spider | .things | .voice |
| .secure | .sports | .think | .vox |
| .security | .spot | .thumb | .war |
| .senate | .square | .tiger | .watch |
| .sense | .star | .time | .way |
| .service | .state | .times | .weather |
| .services | .store | .tolerance | .west |
| .settings | .story | .toys | .white |
| .sex | .street | .trade | .wifi |
| .shareware | .student | .travel | .wine |
| .shoes | .studio | .trend | .wire |
| .shop | .studios | .tribe | .wise |
| .show | .sucks | .tribune | .women |
| .sidewalk | .suite | .truth | .works |
| .site | .surf | .tube | .workshop |
| .skate | .symphony | .txt | .world |
| .ski | .sync | .underground | .worldwide |
| .small | .system | .union | .writer |
| .society | .systems | .unit | .writers |
| .socks | .talk | .unix | .yellow |
| .soft | .tape | .unlimited | .zero |
| .software | .taxi | .up | .zine |
| .solutions | .tech | .usa | .zone |
| .sound | .temple | .video | |
| .soup | .text | .view | |

# EXHIBIT C

**name.space**'s gTLDs Applied for by Other Companies in the 2012 Application Round

| | | |
|---|---|---|
| .academy | .fish | .nyc |
| .ads | .food | .one |
| .africa | .forum | .online |
| .agency | .foundation | .open |
| .art | .free | .orange |
| .associates | .fun | .page |
| .auction | .fund | .partners |
| .audio | .gallery | .photo |
| .band | .game | .pictures |
| .bank | .games | .place |
| .bar | .garden | .play |
| .beer | .gay | .press |
| .berlin | .global | .productions |
| .black | .gmbh | .properties |
| .blog | .golf | .pub |
| .blue | .graphics | .radio |
| .book | .green | .realty |
| .box | .group | .red |
| .broker | .guide | .report |
| .budapest | .guitars | .review |
| .business | .hair | .run |
| .buy | .haus | .sale |
| .cafe | .help | .school |
| .cam | .home | .secure |
| .camera | .host | .security |
| .camp | .hot | .services |
| .capital | .hotel | .sex |
| .care | .house | .shoes |
| .cars | .inc | .shop |
| .casino | .institute | .show |
| .center | .insurance | .site |
| .channel | .irish | .ski |
| .chat | .istanbul | .software |
| .church | .jewelry | .solutions |
| .circle | .kids | .spa |
| .city | .law | .space |
| .club | .limited | .sports |

| | | |
|---|---|---|
| .coffee | .link | .spot |
| .college | .llc | .star |
| .computer | .llp | .store |
| .construction | .london | .studio |
| .consulting | .lotto | .sucks |
| .cool | .love | .surf |
| .corp | .ltd | .sydney |
| .country | .mail | .systems |
| .data | .man | .talk |
| .day | .map | .taxi |
| .design | .market | .tech |
| .digital | .matrix | .theater |
| .direct | .med | .theatre |
| .dish | .media | .toys |
| .dog | .medical | .trade |
| .dtv | .melbourne | .tube |
| .email | .men | .video |
| .enterprises | .money | .vision |
| .estate | .movie | .wales |
| .exchange | .music | .watch |
| .express | .mutual | .weather |
| .family | .network | .wine |
| .farm | .news | .works |
| .fashion | .next | .world |
| .film | .ngo | .zero |
| .finance | .now | .zone |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

COPY

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
name.space, Inc.

**DEFENDANTS**
Internet Corporation for Assigned Names and Numbers

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Morrison & Foerster LLP
555 West Fifth Street, Suite 3500, Los Angeles CA 90013
(213) 892-5200

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT: $_____**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Antitrust Act, 15 U.S.C. Sections 1, 2; Lanham Act, 15 U.S.C. Section 1125(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV12-8676**

FOR OFFICE USE ONLY:    Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT  CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
       ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
       ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
       ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | New York |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____  Date _10/10/12_

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

AO 440 (Rev. 06/12)  Summons in a Civil Action

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| NAME.SPACE, INC. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| INTERNET CORPORATION FOR ASSIGNED | ) |
| NAMES AND NUMBERS | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No. **CV12-8676—PA**
( PLA )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Internet Corporation for Assigned Names and Numbers
12025 Waterview Drive, Suite 300
Los Angeles, California 90094

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Mark R. McDonald
Morrison & Foerster LLP
555 West Fifth Street, Suite 3500
Los Angeles, California 90013

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  OCT 1 0 2012       _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Paul Abrams.

The case number on all documents filed with the Court should read as follows:

## CV12- 8676 PA (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY